UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| PLATE, LLC, | ) |
| *Plaintiff,* | ) ) ) |
| v. | ) No. 3:18-CV-265 ) ) Judge Collier |
| ELITE TACTICAL SYSTEMS, LLC, *et al.*, | ) ) ) |
| *Defendants.* | ) |

**M E M O R A N D U M**

Before the Court is the motion (Doc. 11) of Plaintiff Plate, LLC ("Plate") for a preliminary injunction against Defendants Elite Tactical Systems, LLC, Jim Hansen, and George Loveday (collectively, "ETS") in connection with Plate's claims of patent infringement. ETS responded in opposition (Doc. 18). A hearing on Plate's motion was held on July 24, 2018. For the reasons that follow, as well as those expressed during the hearing, the Court will **DENY** Plate's motion (Doc. 11).

**I. BACKGROUND**

Plate sells firearm accessories. One of its products is a pistol magazine loading device. The loader allows users to load multiple rounds of ammunition into a magazine at a time. The device lies on a flat surface and has a curved "trough," running end to end. Bullets are fed into the trough at one end of the device, with both ends of each bullet secured in place by cut-out "ledges" in the trough. The pistol magazine clips into the device at its other end. The user then pushes the bullets through the trough, which are fed into the magazine all at once. Plate's founder—Chris Plate ("Mr. Plate")—says he came up with the product's initial design in 2015.

He reached out to ETS—a manufacturer and seller of ammunition magazines and magazine loaders—via Facebook in June 2016. (Doc. 18-1.) Mr. Plate asked whether ETS was interested in being featured in an upcoming product launch, though Mr. Plate did not identify his product then. (*Id.*) The parties communicated further, and ETS agreed to send Mr. Plate some of its magazines with which to test his loading device. (*Id.*) A few days after ETS sent the magazines, Mr. Plate raised the possibility with ETS of assisting in commercial development of his loader. (*Id.*)

Communication continued. Over the course of the next month, ETS signed a non-disclosure agreement (the "First NDA"), and Mr. Plate sent ETS videos of his loader prototype, an actual prototype, computer-aided design ("CAD") drawings, and a patent application for the device. (*Id.*) The parties discussed possible prices for the intellectual property, as well as prior art. (*Id.*)

ETS considered forging a business relationship with Plate, but it had concerns. In its view, the loading device was bulky and performed inconsistently. (*Id.*) It was also concerned that certain prior art would preclude meaningful patent protection for the Plate design.[1] (*Id.*) Still, ETS believed it might be able to improve the product, but it was unwilling to discuss those ideas under the NDA previously signed. The parties executed a second NDA in early October 2016 (the "Second NDA"). (*Id.*)

By the end of October, however, ETS determined improvement was impractical and decided not to partner with Plate. It instead designed its own loader—a handheld, T-shaped device. The magazine clips into the device at one end. The bullets are lined up along the length of the

---

[1] Specifically, ETS was concerned about two published patent applications, referred to in the parties' briefs as Urcheck and Fiorucci.

"wand" end of the device, secured in place by grooves at only the cartridge ends of the bullet. The user then employs a separate device to push the bullets along the wand, feeding them into the magazine. ETS filed a provisional patent application covering the design on December 23, 2016, and released a promotional video advertising the device that same day. (*Id*.)

Mr. Plate was none too pleased. He sent ETS a cease-and-desist letter on January 10, 2017, accusing ETS of violating the First NDA, but ETS did not immediately respond.[2] (Doc. 12 at 7.) On January 19, 2017, Jim Hansen was served with the cease-and-desist letter at a Las Vegas gun convention called "Shot Show." (*Id*.) ETS responded thereafter with a letter of its own denying both infringement and breaching either NDA. (*Id*.) ETS began selling its loader for 9mm pistols on June 30, 2017.[3] (*Id*.)

Months passed. On January 23, 2018, ETS began selling its magazine loader for .38 caliber and .40 caliber bullets, as well as its second generation model for 9mm pistols.[4] (*Id*.) Mr. Plate sent ETS a second cease-and-desist letter that same day, alleging ETS's device infringed his patents, which ETS denied in its response letter. (*Id*.)

This suit followed. Plate filed its complaint on June 29, 2018 (Doc. 1), and a motion for a preliminary injunction on July 2, 2018 (Doc. 11). Plate asks the Court to enjoin ETS from selling

---

[2] The parties, at the hearing, disputed whether this first cease and desist letter was ever received.

[3] ETS notes that Mr. Plate, himself, placed two orders for ETS loaders that same day, and would place three other such orders over the next three months. (Doc. 18-1 at 10.) ETS also notes that just a few months thereafter, Plate began offering for a sale a new loader very similar in design to ETS's. (*Id*.) Plate offers this loader for $14.95.

[4] The original price for the device was $49.00, but ETS determined they had overpriced the product. It lowered the price to $29.99, where it sits now. (Doc. 18-1 at 10.)

its loading device on the grounds the device infringes upon five of Plate's patents: the '286, '633, '552, '669, and '220 patents.[5] (Doc. 11.)

## II. DISCUSSION

A patentee seeking a preliminary injunction must establish: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375-76 (Fed. Cir. 2009). Failure to demonstrate any of these factors justifies denial of relief. *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994).

### A. Likely Success on the Merits

A patentee demonstrates a likelihood of success on the merits by showing "it will likely prove infringement of one or more claims of the patents-in-suit, and that at least one of those same allegedly infringed claims will also likely withstand the validity challenges presented by the accused infringer." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). Infringement analysis requires two steps. First, the court construes the claims, defining their scope. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Second, the Court compares the claims, as construed, to the accused device. *Id.*

Plate advances two primary infringement arguments. It first addresses the way in which the bullets are secured and shepherded downward in each product. Plate's device has two "ledges" carved into opposite sides of the trough—a "first rounds recess ledge" and a "second rounds recess ledge." (Doc. 12 at 7.) Under each ledge is empty space, referred to as the "first case cavity" and

---

[5] Plate claims infringement of five separate patents. However, each of these patents is very similar—so similar, in fact, that during the hearing, counsel for Plate primarily referred to its "device" or "loader" in the singular. For simplicity's sake, the Court does so here, too.

the "second case cavity." (*Id.*) The nose end of the bullet fits into the first case cavity, while the cartridge end fits into the second case cavity. (*Id.*) Plate argues ETS's device, though visually different, has exactly these features. It points the Court to a downward view of the ETS device, a rectangular space through which the bullets are eventually fed. (Doc. 12-9 at 26.) Plate says the entire top side of the rectangle constitutes two "ledges" that simply "form into each other," and calls the space beneath those ledges the first and second case cavities. (*Id.* at 5.) In this sense, Plate argues, the ways in which the products hold their respective bullets in place actually mirror one another.

In response, ETS first emphasizes that its device secures the bullets in place at only one end of each bullet, not at both ends like Plate's. In fact, it notes, Plate's patent claims require each first case bullet end be "positioned within the first case cavity and under the first rounds recess ledge" and each second case end be "positioned within the second case cavity and under the second rounds recess ledge." (Doc. 12-9 at 4.) ETS's loader, in contrast, grips only the cartridge end of the bullet, leaving the nose end unsupported. With respect to the rectangular portion of its device through which the bullets move downward towards the magazine, ETS argues there is no "ledge" at all, much less two. And even if the space under the top side of the rectangle does constitute a "cavity," ETS says, that still leaves but a single cavity through which bullets are guided, rather than the two described in Plate's patents. (Doc. 18 at 7.)

ETS's points are well-taken. First, its device secures the bullets in place at only one end of each bullet, contrary to what Plate's patent claims require. Furthermore, Plate's description of the rectangular view of the ETS device is strained at best. It says the top side of the rectangular space through which the bullets are fed is actually two ledges that simply meet at the same point and form into each other. But such is a description of a straight line, not a "ledge." In an effort to

survive that criticism, Plate argues that all ETS has done, essentially, is added a connecting piece between the ledges; and *adding* such an element, Plate says, as opposed to taking away elements, is generally insufficient to avoid infringement. However, even assuming ETS did merely add a connecting piece, what it accomplished, in effect, was subtraction by addition. When it added the hypothetical piece, it thereby *removed* the ledges—creating a single side that hugs the bullet from end to end. Because ETS's device secures each bullet differently than the way claimed in Plate's patents, Plate has not demonstrated infringement on this element.

Plate's second argument focuses on the way in which the devices feed their respective bullets into the magazine. Plate says the "unique geometry" of the walls of its device is the heart of the patent. Those walls form a short tunnel, angled diagonally downward into the magazine, referred to as the "rounds cavity." As the bullets pass through the rounds cavity, the nose and cartridge ends of each bullet are secured by an "upper rounds cavity abutment" (a "ceiling") and a "lower rounds cavity abutment" (a "floor"), respectively. Once pushed through, the bullet hits a slanted wall, called the "rounds abutment." This tilts the bullet at an angle, allowing it to be fed into the magazine. In the parlance of Plate's patent, the upper and lower cavity abutments "abuttingly limit movement of the rounds along a movement plane when the rounds exit the rounds cavity"—pivoting the bullet at the appropriate diagonal angle. (Doc. 12-5 at 16.) Plate identifies an upper and lower rounds cavity abutment in ETS's device and argues that they serve the exact same function as those in Plate's device—angling the bullet downward into the magazine.

While the bullets are similarly angled in its device, ETS argues that the "ceiling" and "floor" of its rounds cavity do not manipulate the bullet in the same way that Plate's do. ETS notes that Plate's patent requires that the cavity abutments "abuttingly limit movement of the rounds . . . *when the rounds exit the rounds cavity*." (*Id.*) (emphasis added). However, the

6

abutments in its device, ETS notes, do *not* limit the movement of the bullet *when* the bullet exits the rounds cavity. Once the bullet hits the rounds abutment, ETS explains, the upper and lower abutments are no longer in contact with the bullet itself. (Doc. 18 at 13.) And because at that point—when the rounds exit the rounds cavity—the upper and lower abutments do not "abuttingly limit the movement" of the bullet, ETS's device does not infringe.

As an initial matter, the Court notes that the device's "unique geometry" to which Plate referred during the injunction hearing was never precisely explained. Both counsel for Plate and Plate's expert witness used the term, but upon inquiry from the Court, neither explained what was unique specifically about the device's geometry. The Court expressed then, as it does now, doubt as to whether the exact geometry of the rounds cavity was so unique that it is the only such shape that would successfully feed the bullets into the magazine.

But beyond that, ETS makes a compelling argument. Plate's patent claims require that the upper and lower cavity abutments "abuttingly limit movement of the rounds . . . when the rounds exit the rounds cavity." (*Id.*) As the rounds exit the rounds cavity in the ETS device, however, the upper and lower abutments do not limit the movement of the bullet, because at that point, they no longer touch the bullet. (Doc. 18 at 13, Doc. 12-9 at 34.) The bullet, by then, has moved past the abutments, into the slanted wall. Without this limiting feature as specifically described in the patent language, ETS's device does not infringe this element.

Because ETS's device lacks the above elements, Plate has failed to demonstrate a likelihood of success on the merits.[6]

---

[6] Because Plate has failed to meet its burden on the question of infringement, the Court need not reach the issue of the patents' validity.

### B. Irreparable Harm

Even assuming Plate has demonstrated a likelihood of success on the merits, however, it has wholly failed to show irreparable injury. Plate alleges three distinct harms: (1) loss of customers, (2) damage to reputation and goodwill, and (3) price erosion. Each is a recognized basis for a finding of irreparable harm, but not as a matter of law. *See Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1010–11 (Fed. Cir. 2009). Plate must make "a clear showing" that the harm it will suffer is irreparable. *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012). It has not done so.

First, Plate argues it will permanently lose customers because of the nature of the product. Because gun owners can load only one magazine at a time, it explains, a customer will likely buy only one magazine loader for each type of magazine the customer uses—meaning Plate will lose out on that sale. In terms of loss to reputation and goodwill, Plate claims the ETS device has developed a reputation of being unreliable, highlighting a number of poor online reviews. And because users have come to view the ETS loaders as inferior, Plate says, users will doubt the quality of all loaders, including Plate's. Finally, Plate argues that, because of the ETS device's poor reputation, ETS must charge a lower price than Plate had planned to charge for similar products—meaning Plate must now follow suit to generate sales.

For each of these alleged harms, ETS's arguments to the contrary express a common theme—lack of evidence. To begin, ETS notes that Plate has offered no evidence that it has any customers to lose; at no point has it presented any sales figures to the Court. For this reason, too, ETS argues, Plate has failed to demonstrate it even has a reputation or goodwill to damage. Further to this point, ETS calculates that the number of customer complaints it receives totals only about one percent of all loaders sold. Finally, ETS disputes price erosion by first pointing out that Plate

8

charges a lower price than ETS—Plate's website offers a price of $14.95, while ETS sells its loader for $29.99. ETS also notes that, if anything, its price is on the high side of the range of prices at which market participants sell magazine loaders, and that any lower price at which Plate sells its device is simply a function of market competition—which alone, is no grounds for an injunction.

The Court agrees. While Plate has cited valid bases, in general, for a finding of irreparable harm, it has supported those claims with little to no evidence. First, with no sales figures of any kind before it, the Court has no basis on which to conclude, or even speculate, that Plate has lost, or will lose, customers. Further, Plate's argument as to the one-time-purchase nature of the device is unpersuasive. Beyond the fact that gun owners can load only one magazine at a time, Plate has failed to explain why a potential customer's first magazine loader purchase would be its only such purchase. If the gun owner is dissatisfied with his first magazine loader, he may very well seek a different brand of loader for that same firearm, or any other firearm he may own. Additionally, there must be a "causal nexus" between the alleged infringement and the alleged loss of customers, *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 735 F.3d 1352, 1360 (Fed. Cir. 2013), and Plate has alleged no such connection.

Plate has similarly failed to show it has a reputation or goodwill to damage. Again, Plate points to no sales of its device nor any measure of diminishing market share. Nor does Plate claim customers have confused the allegedly inferior ETS device for one of its own. Plate instead, relies on poor product reviews of the ETS device, suggesting those reviews reflect the public's view of magazine loaders more broadly.[7] But this is belied by the ETS device's sales-to-complaint ratio.

---

[7] During the hearing, the Court suggested that different types of handguns are more amenable to loading than others, and that perhaps many of the bad reviews were aimed at those types of guns—that is, maybe the bad reviews had more to do with the type of gun than the loader itself. Plate, though, could not speak to whether the bad reviews referenced more-difficult-to-load guns or rather was across-the-board criticism.

As of July 2018, ETS had sold over 50,000 loaders with a return rate of less than one percent, and ETS estimates less than one percent of customers contact ETS with complaints. (Doc. 18-1 at 11.) ETS also points to a number of websites, including Amazon, in which user feedback is overwhelming favorable. (*Id*.) The Court is unpersuaded that a handful—even a large handful—of poor reviews implies that the public is so displeased with ETS loaders that it now looks unfavorably on the magazine-loading concept in general.

And finally, Plate has failed to demonstrate price erosion. For starters, this argument is primarily premised on the ETS device's allegedly bad reputation. But, as just noted, considering the ETS device's gross sales ($1,049,927.00) and the comparatively small percentage of poor customer reviews, the Court fails to see how ETS has eroded the price of loaders generally. Also telling is the price of Plate's device—$14.95. Not only is this lower than what ETS charges at $29.99; it is barely *half* that amount.[8] In light of the number of other participants in the market and the thirty-dollar price range across available products (Doc. 18-1 at 12), Plate's pricing looks more like a function of market competition than ill-gotten market share on the part of ETS.

Also damaging for Plate is the time it took to seek injunctive relief. Delay "militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *High Tech Med. Instr., Inc. v. New Image Indus.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995). Here, Plate knew ETS was selling the allegedly infringing loader since at least June 2017; Mr. Plate himself ordered two of the loaders at that time. (Doc. 18-1 at

---

[8] The Court suggests here, as it did during the hearing, that lower prices tend to attract customers. This is especially evident in medicine sales; once the cheaper generic version of a medicine hits the shelves, it often snatches up much of the name brand's customer base. But Plate has pointed to no similar effect with its own product; it has pointed to no sales at all, even though its device is half the price of ETS's. This suggests to the Court something else may be afoot—perhaps a difference in quality between the products.

10.)  Plate, however, waited until June 29, 2018 to file suit—roughly a year later.  For its part, Plate did serve two cease-and-desist letters on ETS, the first of those right after ETS released its first promotional video for its device.  (Doc. 12 at 7.)  Still, Plate did not serve its second cease-and-desist letter until January 23, 2018—over four months before filing the instant motion.  (*Id*. at 8.)  This delay cuts against Plate's claim that the harm it will suffer in the absence of injunctive relief is both imminent and irreparable.

C. **Balance of Equities**

Plate's failure on the irreparable harm prong is damaging, too, with respect to the remaining two factors.  First, before granting a preliminary injunction, a court must "balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the nonmoving party will incur if the injunction is granted."  *Hybritech, Inc. v. Abbot Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1998). With no evidence of sales, customer relationships, market share, or goodwill, Plate has very little to lose in the absence of injunctive relief.  If ETS were forced to pull its products from the shelves, however, it would likely lose hundreds of thousands of dollars in sales over the course of a year, could not fulfill outstanding orders, and—standing accused of patent infringement—might very well take a significant reputational hit. (Doc. 18-1 at 12.)  Plate argues such harm pales in comparison to its inability, at the hands of ETS, to capture what it calls a virgin market.  But in light of the merits analysis above, Plate has provided the Court no tools with which to measure that alleged harm.  Accordingly, the balance of equities tips in ETS's favor.

D. **Public Interest**

Finally, the public does have a strong interest in the protection of patent rights, as this encourages innovation.  *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006).  But this interest is counterbalanced by a defendant's right to compete in the market—a right

deemed especially compelling where the plaintiff makes a "remote" showing on the likelihood of success on the merits, as is the case here. *Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990). Moreover, no one will be denied an allegedly superior product absent an injunction; the public is free, at this moment, to purchase Plate's loader if it wishes. The Court thus finds injunctive relief, here, would not serve the public interest.

### III. CONCLUSION

For the foregoing reasons, the Court will **DENY** Plate's motion. (Doc. 11.)

**An order shall enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**